

Computer Forensics, LLC
1880 N. Congress Ave Suite 333
Boynton Beach, FL 33426
Main: 561.404.3074
www.ComputerForensicsLLC.com

# EXPERT REPORT REGARDING TESTING OF IPP INTERNATIONAL UG'S INFRINGEMENT DETECTION SYSTEM

Prepared By:    Patrick Paige, EnCE SCERS
                Managing Member
                Computer Forensics, LLC

Exhibit B

## DECLARATION OF PATRICK PAIGE

**I, PATRICK PAIGE, DO HEREBY DECLARE:**

1. I am over the age of eighteen (18) and otherwise competent to make this declaration. The facts stated in this declaration are based upon my personal knowledge.

2. I was a police officer from 1989 until 2011 for the Palm Beach County Sherriff's Office. And, from 2000-2011, I was a detective in the Computer Crimes Unit. After leaving the Palm Beach County Sherriff's Office, I founded Computer Forensics, LLC, where I am currently employed.

3. I have taken over 400 hours of courses designed to teach people how to conduct computer forensic examinations.

4. Also, while working from 2003-2011 for Guidance Software, the makers of EnCase, I taught over 375 hours of courses in computer forensics ranging from beginner to advanced levels.

5. As a computer crimes detective for the Palm Beach County Sheriff's Office, I have conducted forensic computer examinations for:

    (a) Broward County Sheriff's Office (BSO);

    (b) Federal Bureau of Investigation (FBI);

    (c) U.S. Customs and Border Protection (CBP);

    (d) Florida Department of Law Enforcement (FDLE);

    (e) U.S. Secret Service;

    (f) Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF); and

    (g) Various municipalities in the jurisdiction of Palm Beach County.

6. I have had students in my courses from various government branches, including: (a) sheriff's offices; (b) FBI agents; (c) ATF agents; (d) agents from the Central Intelligence Agency; and (e) individuals from other branches of government and the private sector.

7. I have received the following awards and commendations:

   (a) 1991 – Deputy of the Year, awarded by the 100 Men's Club of Boca Raton & Rotary Club.

   (b) 1997 – Deputy of the Month for June.

   (c) 2001 – Detective of the Month for October.

   (d) 2002 – Outstanding Law Enforcement Officer of the Year, awarded by the United States Justice Department for work in the *U.S. vs. Jerrold Levy* case.

   (e) 2003 – U.S. Customs Service Unit Commendation Citation Award for computer forensic work in Operation Hamlet. Operation Hamlet was one of the largest rings in the history of U.S. Customs of individuals who were molesting their own children, and transmitting the images and video via the Internet.

   (f) 2005 – Detective of the Month for December.

   (g) 2006 – Letter of Commendation issued by the FBI for outstanding computer forensic work in the *U.S. vs. Frank Grasso* case.

   (h) 2007 – Outstanding Law Enforcement Officer of the Year, awarded by the United States Justice Department for work in the *U.S. vs. Jimmy Oliver* case.

8. I have testified as a fact and expert witness on numerous occasions in the field of computer forensics in both trial-level and appellate proceedings before state, federal, and military courts in California, Florida, Indiana, New Jersey, New York, and Pennsylvania.

9. No court has ever refused to accept my testimony on the basis that I was not an expert in computer forensics. My skill set and my reputation are my most important assets in my current position with Computer Forensics, LLC.

10. As part of my duties within the Computer Crimes Unit at the Palm Beach County Sherriff's Office, I investigated cases involving the use of the Internet, including cases involving peer-to-peer file sharing networks. In this role, I also investigated Internet child pornography and computer crime cases.

11. I was assigned to the Computer Crimes Unit that worked in conjunction with a private company called TLO Corp.

12. When I worked with TLO Corp., I supervised the other detectives assigned to the unit, which consisted of six online investigators and two computer forensic examiners.

13. In my experience, during the initial phase of Internet based investigations, the offender is only known to law enforcement by an IP address.

14. The only entity able to correlate an IP address to a specific individual at a given date and time is the Internet Service Provider ("ISP").

15. Once provided with the IP Address, plus the date and time of the detected and documented activity, ISP's can use their subscriber logs to identify the name, address, email address and phone number of the applicable subscriber in control of that IP address at the stipulated date and time.

16. With regard to my experience investigating child pornography cases, I supervised police officers whose responsibility it was to establish a successful TCP/IP connection with persons who were sending pornographic images of children or other illegal content over the Internet using peer-to-peer file sharing programs.

17. The offenders' IP addresses, as well as the dates and times of the illegal transmission were recorded.

18. An officer would then request that the assistant state attorney subpoena the corresponding ISPs for the purpose of identifying the subscribers that were transmitting the illegal content.

19. In these cases, the subscribers were not notified by the ISPs that their identity was being subpoenaed because they could have deleted the images and destroyed the data.

20. After receiving the subscribers' identities, we would prepare a search warrant that would authorize us to enter the subscribers' dwelling and seize all of their computer devices.

21. I was directly involved in approximately 200 search warrants either by way of managing the process or performing it personally while at the Computer Crimes Unit.

22. From my experience, Plaintiff is likely to identify the infringer. Indeed, during my time in the Computer Crimes Unit, I can recall only one instance in all the times that we executed a search warrant and seized computers, where we did not find the alleged illegal activity at the dwelling identified in the search warrant.

23. In that one instance, the Wi-Fi connection was not password protected, and the offender was a neighbor behind the residence.

24. I never came across a Wi-Fi hacker situation.

25. In my opinion, a child pornographer has a greater incentive to hack someone's Wi-Fi connection than a BitTorrent user because transmission of child pornography is a very serious crime with heavy criminal penalties, and many offenders can face life sentences if convicted.

26. The process used by law enforcement mirrors the process used by Malibu Media and IPP to correlate an IP address to an individual.

27. In order to ascertain the identity of the infringer, just as with law enforcement, Malibu Media must subpoena the ISP to learn the subscriber's true identity.

28. I tested IPP International U.G.'s ("IPP") infringement detection system. The infringement detection system is named "Observer." It is owned and used by IPP to identify individuals who are illegally downloading and distributing content via BitTorrent. This technology and similar investigative methods are used by law enforcement officials when tracking individuals who transmit contraband files such as child pornography via the Internet.

29. I tested IPP's infringement detection system for its accuracy in detecting and recording infringement via BitTorrent, ascertaining an infringing IP address[1], and identifying the "test" files being distributed on BitTorrent.

30. To conduct this test, I first downloaded four public domain movies from the national archive.

31. I then encoded text into each video. The purpose of this encoding was to ensure that when the file is located and download by IPP, it could be easily identified as the videos I personally encoded and seeded.

32. I then setup and configured four computers, each of which was connected to the Internet and each computer was configured with its own unique static IP address.

33. I then configured three computers with a Windows 7 operating system, and the fourth computer was a MacBook Pro configured with OS X El Capitan version 10.11.4. I installed a different BitTorrent client[2] onto each computer system as listed below:

---

[1] An IP address is a numerical value assigned to a computer or device that transmits and receives data via the Internet. When a computer user accesses the Internet, their Internet Service Provider assigns them a unique IP address for that session. In order to identify a computer user who is downloading files via the Internet, one must be able to identify the IP address the user was using at that exact time and date of downloading.

[2] A BitTorrent client is software that enables the BitTorrent protocol to work.

6

| Computer | Operating System | BitTorrent Client |
|---|---|---|
| Dell Laptop | Windows 7 | uTorrent Version 3.4.7 |
| Dell Laptop | Windows 7 | qBittorrent Version 3.3.4 |
| Dell Laptop | Windows 7 | Transmission Version 2.84 |
| MacBook Pro Laptop | OS X El Capitan 10.11.4 | uTorrent Version 1.8.7 |

34. After installing the BitTorrent clients, I also installed Wireshark and WinDump onto each computer. Wireshark and WinDump are programs that capture network traffic and create PCAP files. PCAP stands for "packet capture." PCAPs are akin to videotapes. Indeed, a PCAP is like a video recording of all the incoming and outgoing transactions of a computer. I have used Wireshark and WinDump software while in law enforcement to examine network traffic while investigating P2P cases.

35. After installing Wireshark and WinDump onto each of the computers, I transferred the movie files that I created for the test to each of the four computers.

36. I then used one of the BitTorrent clients on the test computers to make .torrent files. I then seeded the four test movies.

37. On June 3, 2016 the test was conducted. Given only the torrent files, IPP was able to correctly identify all four static IP addresses for each of the test computers that were seeding the movies within minutes of starting the test. Soon after the test, IPP sent me the PCAP files they recorded during the test for each one of my static IP addresses.

38. I reviewed IPP's PCAPs vis-à-vis the PCAP log files created by each of my test computers, and determined that IPP's PCAPs match my PCAPs. This could not have happened unless IPP's server was connected to the test computers because the transactions would not match.

39. I also conducted an examination of IPP's PCAPs to determine if the detection software can accurately identify the BitTorrent clients I used during the test. Using Wireshark

7

software I loaded IPP's PCAPs recorded on the day of the test. IPP's system was able to accurately record the names and version numbers of all four BitTorrent client's software I used on each of the test computers.

40. When a BitTorrent client is installed onto a computer, the computer randomly selects a port number for its network communication. A port number is an integer ranging from 0 to 65535. The following is a chart listing the port number assigned to each of the test computers:

| Computer | BitTorrent Client | Port |
|---|---|---|
| Dell Laptop | uTorrent Version 3.4.7 | 51892 |
| Dell Laptop | qBittorrent Version 3.3.4 | 8999 |
| Dell Laptop | Transmission Version 2.84 | 51413 |
| MacBook Pro Laptop | uTorrent Version 1.8.7 | 10088 |

41. Examination of IPP's PCAP revealed that the port numbers recorded by IPP's system matched the port numbers from the test computers used for BitTorrent communications. Accordingly, my analysis confirmed that IPP was able to accurately identify the port number assigned to each test computer's BitTorrent client.

42. From this test, I concluded that IPP's infringement detection system worked, and had a subpoena been issued for my IP addresses, it would have revealed my identity. I also concluded that IPP's infringement detection system accurately identifies the BitTorrent clients as well as the BitTorrent client's port number.

43. In the past, Malibu has also retained Excipio GmbH's ("Excipio") to track infringement of Malibu's copyrighted works. In June 2013, in anticipation of the Bellwether trial in the Eastern District of Pennsylvania, I conducted a test of Excipio's infringement detection system. After performing the test, I concluded that Excipio's infringement detection system works. Specifically, the system accurately records the IP address of a person using

BitTorrent to transmit data to Excipio's computer servers. Excipio's system operates nearly the same fashion as IPP's system.

44. In addition to testing Malibu's investigators' systems, I have also conducted computer forensic examinations for Malibu in their copyright infringement cases throughout the country.

45. Indeed, in my role as an expert for Plaintiff, I have examined countless computer hard drives for evidence of: (a) the use of BitTorrent; (b) infringement of the copyrighted "X-Art" works owned by Plaintiff; (c) spoliation of evidence; and (d) suppression of evidence. These examinations have revealed either: (1) evidence of copyright infringement of Malibu Media, LLC's works; or (2) evidence of suppression and spoliation. Sometimes I have found both. By way of illustration, below are examples where Malibu obtained a Defendant's hard drive and discovered evidence of its movies, spoliation, and/or defendants' failures to disclose all hard drives.

    a. *Malibu Media, LLC v. Weaver*, No. 8:14-cv-01580-VMC-TBM (M.D. Fla. 2015): In *Weaver*, the Court ordered production of the hard drives, and my forensic examination revealed evidence which irrefutably demonstrated: (a) Defendant's BitTorrent use; (b) the prior existence of numerous X-Art titles; (c) the deletion of BitTorrent files and uninstallation of a BitTorrent client; and (d) the existence of other computer devices that have not been produced. Because of this examination, Malibu was able to successfully disprove Defendant's denial of infringement.

    b. *Malibu Media, LLC v. Huseman*, No. 1:13-cv-02695-WYD-MEH (D. Colo. 2014): In the *Huseman* case, I discovered evidence of: (a) BitTorrent use; (b) the prior existence of numerous X-Art titles; (c) the deletion of BitTorrent files and uninstallation of a BitTorrent client; and (d) the existence of other computer devices that had not been produced to me for examination, one of which *contained* titles of Plaintiff's copyrighted works. Ultimately, the parties stipulated to a final judgment in favor of Malibu Media, LLC.

    c. *Malibu Media, LLC v. John Doe*, No. 1:14-cv-10155-KBF (S.D.N.Y. 2015): My forensic examination revealed that defendant had over eleven different file destruction software programs on his hard drive – each with the capability of destroying substantial amounts of data. He used several of the software programs

just days before turning it over for imaging and examination. I also detected that prior to defendant's use of the file destruction software, the defendant connected another undisclosed external storage device to his hard drive. This suggested that defendant was storing data which he wanted to retain prior to using the file destruction software programs on his hard drive. Ultimately, the defendant admitted to his infringement and apologized to Malibu.

d. *Malibu Media, LLC v. Tashiro*, No. 1:13-cv-00205-WTL-MJD (S.D. Ind. 2014): My examination revealed that defendants deleted thousands of BitTorrent files the night before producing the hard drives for imaging. My examination also revealed that defendants possessed and used other hard drives which were never disclosed or produced during discovery. Ultimately, the court imposed terminating sanctions against defendants for failure to disclose documents, spoliation, and perjury.

e. *Malibu Media, LLC v. John Doe*, No. 12-2078 (E.D. Pa. 2013): In this "Bellwether" case, my examination of defendant's hard drive revealed that he installed a Windows operating system three (3) days after being served with a subpoena for production of his computer device. This installation resulted in the complete destruction of all files contained within the hard drive prior to the Windows installation. After falsely testifying, Defendant admitted that he had downloaded Plaintiff's copyrighted works and had wiped his desktop computer (by installing a new Windows operating system) to conceal the infringements. In the end, the Court entered a substantial judgment in favor of Malibu.

46. I am paid on an hourly basis by Malibu Media, LLC, at the rate of $325.00 per hour for pre-trial investigative work, although the fee increases if I am required to testify at trial.

**FURTHER DECLARANT SAYETH NAUGHT.**

**DECLARATION**

**PURSUANT TO 28 U.S.C. § 1746**, I hereby declare under penalty of perjury that the foregoing is true and correct.

Executed on this 19th day of August, 2016.

By: _____
PATRICK PAIGE